UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

360 CONSTRUCTION COMPANY, INC.,

                    Plaintiff,                  Case Number 11-12344
                                                Honorable David M. Lawson

v.

ATSALIS BROTHERS PAINTING CO.,
GARRY D. MANOUS, NICK ATSALAKIS,
and ANDREW RICHNER,

                    Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING
## IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

       Painting the Mackinac Bridge is an enormous, labor-intensive task, but it must be done with regularity. The Michigan Department of Transportation (MDOT) outsources that project by means of a sealed bid method. The plaintiff in this case, 360 Construction Company, was the successful low bidder on a request for proposal that was returned in June 2010 to clean and paint an eight-tenths-mile span of the Bridge. Defendant Atsalis Brothers had submitted the next lowest bid, and, according to the bid rules, could become the successful bidder if 360 somehow became disqualified. Atsalis Brothers set about to see that disqualification would come to pass, and hired a lawyer/lobbyist, defendant Andrew Richner, to help. Richner and Atsalis Brothers then launched what the plaintiff characterizes as a deliberate smear campaign in an attempt to persuade MDOT to disqualify 360 from the contract. The plaintiff contends that the defendants' statements were defamatory, and the defendants deliberately attempted to interfere with 360's contract and legitimate business expectancy. The defendants insist that everything they told MDOT representatives was true, and even if it was not, the shared interest privilege requires that the plaintiff prove that the

defendants acted with malice when they made their statements.  Ultimately, the defendants' gambit did not work; MDOT went forward with 360 as the contractor.  But the Bridge Authority did not award the contract to 360 until January 2011, and 360 lost all of the summer and fall work season, leaving it with only 22 months to complete a 28-month cleaning and painting job.  That delay, it says, caused substantial damages.

The plaintiff's complaint in this Court alleges defamation, interference with a business expectancy and a contract, "unlawful disparagement," and negligence.  Discovery has closed and the defendants have moved for summary judgment.  The Court heard oral argument on December 4, 2012 and now concludes that the plaintiff has not offered evidence or argument to support its claims of tortious interference with a contract, "unlawful disparagement," negligence, or *respondeat superior*, and those claims must be dismissed.  However, the record demonstrates that fact questions abound on the counts alleging defamation and interference with a business expectancy, even in light of the shared interest privilege alleged; summary judgment must be denied on those counts.

I.

The crux of the case lies in the relationship of the owners and operators of 360 Construction with another painting company, All State Painting of Brunswick, Ohio, which also is referred to by the parties as Allstate Painting and Contracting Co.  Allstate and the Mackinac Bridge Authority had done business previously, with an unsatisfying outcome that resulted in litigation.  The defendants' strategy was to establish an affiliation between 360 and Allstate so that the MDOT's bad experience with the latter would sour its attraction to the former as a painting contractor.

Allstate Painting is a defunct bridge painting company that was owned by Elias Kafantaris.  Allstate had a contract to paint the "South/Center" span of the bridge around 2003 and 2004, but did

-2-

shoddy work, failed to honor its warranty, and walked off the job. Allstate wound up being sued by the Mackinac Bridge Authority for $1 million for various breaches. George Roditis worked for Allstate from the late 1990s until 2004 as a "vice president," and by his account presented himself as an "owner" of the company in order to attend preconstruction meetings and other events as a company representative. Elias Kafantaris testified that he passed bribes to an Ohio transportation official between 1999 and 2006, and that in some cases he gave money to George Roditis to pay the bribes. George Roditis also testified in 2010 that he passed bribes on behalf of Kafantaris and Allstate.

Steve Roditis, George's brother, formed 360 Construction in 2001, but did not begin operations until 2004. Steve and George Roditis both worked in the bridge painting industry. George was never an owner of 360. Steve Roditis worked for Allstate Painting as a laborer in 1995, and again as a certified "competent person" (according to Steve Roditis, he was a certified hazardous material disposal handler) in 2003-04.

Steve Roditis left Allstate in 2004 to start his own bridge painting company, 360 Construction. The defendants have not alleged that Steve Roditis was involved in any of the Kafantaris and Allstate bribery incidents, although they do imply that he was "involved" in the South/Center span project as an on-site supervisor or quality control person.

The defendants collectively filed nearly 1,500 pages of briefs and exhibits in support of their motions for summary judgment, with the Atsalis defendants owning two-thirds of that total — more than 1,000 pages. The Atsalis defendants devote much of their briefing to proving the sordid history of Allstate, Kafantaris, and George Roditis, but the plaintiff disputes none of those facts. Moreover, the parties do not dispute the basic facts that anchor this case, which relate to just four

communications: (1) an email and (2) a letter sent by Atsalis employees to MDOT officials; (3) a phone call made by attorney Andrew Richner to Leon Hank at MDOT; and (4) a memo written and circulated by Richner to officials at MDOT, the Bridge Authority, and other state offices. The Atsalis Brothers and Richner do not dispute what they wrote and to whom they sent it. Richner disputes parts of the conversation that Hank attributed to him.

According to the filings in this case, on June 7, 2010, Christos Bakalis of Atsalis Brothers sent an email to Kim Nowack of the Mackinac Bridge Authority, in which Bakalis wrote:

> Nick [Atsalakis] is having me email a few articles over to you regarding 360 Construction and Allstate [sic] Painting. You will see that [Elias] Kafantaris was convicted of fraud, tax evasion, and other charges. Kafantaris, under oath, says that Roditis participated in the bribing of an Ohio project manager. An assistant US attorney found evidence that Allstate funneled $45,000.00 to this employee. There are a few links below that include all of this information and show that Roditis is the current owner of 360 Construction. The last link includes the number to the assistant US attorney that found evidence of Roditis and Kafantaris bribing the state employee. He should be able to elaborate on their relationship and Roditis' involvement. If you have any questions, feel free to call Nick any time at 810.560.5635.

Resp. to Mot. for Summ. J. [dkt. #90], Ex. I, Email dated June 7, 2010. Bakalis referred several times to "Roditis" in the email, but did not state whether the reference was to Steve Roditis or George Roditis.

Bakalis included four internet hyperlinks in his email, to (1) the articles of incorporation for 360 Construction Company, Inc., dated August 5, 2001, which showed George Roditis as an incorporator; (2) a Cleveland.com news article dated November 12, 2009 reporting the conviction of Ohio transit authority construction manager Faisal Alatrash for corruption, based on bribes that Alatrash took from Elias Kafantaris, owner of All State Painting and Contracting Co., between 1999 and 2006; (3) a second Cleveland.com article dated December 11, 2009, reporting the sentencing

-4-

of Kafantaris to six months on twenty-four counts of tax evasion and four counts of ERISA fraud

relating to his ownership of All State Painting and Contracting Co. and CH-IK Painting, Inc.; and

(4) a press release from the United States Attorney for the Northern District of Ohio, dated April 15,

2009, reporting the indictment of Kafantaris in the tax evasion and ERISA fraud case. The second

link that Bakalis sent (Cleveland.com article dated November 12, 2009), reported that Kafantaris

testified that he "passed along money to his partner George Roditis to pay Alatrash," and that

Kafantaris said "George told me that he needed money for Mr. Alatrash." Resp. to Mot. for Summ.

J. [dkt. #90], Ex. I, Email dated June 7, 2010 at 5.

On June 9, 2010, Garry D. Manous, a project manager for Atsalis Brothers, sent a letter on

Atsalis letterhead to Gregory C. Johnson at the Michigan Department of Transportation. Manous

wrote:

> This letter is in regards to Project Number 86000-M00221 of the June 4, 2010 letting
> for cleaning and coating the existing structural steel on I-75 over the Straits of
> Mackinac from pier 21 on the Mackinac Bridge northerly to pier 34.
>
> The low bidder on this project was 360 Construction Company, Inc. of Ohio. We
> would like to bring to the Department's attention that 360 Construction Company,
> Inc. is simply a restructured version of the former All State Painting of Brunswick,
> Ohio whom the Mackinac Bridge Authority currently has a $1 million dollar lawsuit
> against.
>
> The lawsuit states that Allstate [sic] Painting and Contracting left the project in 2006
> without fixing the flaws, four years after it was awarded a contract to sandblast and
> paint steel posts and beams below the bridge deck.
>
> Please see the following attachments.
>
> •    Michigan News article dated December 31, 2008 describing the lawsuit
>      above.
>
> •    Ohio Biz listing which names **George Roditis as Owner of All State
>      Painting**.

-5-

- LocalConstruction.net listing which names **George Roditis as a representative of All State Painting**.

- Cleveland.com article dated November 12, 2009 linking **George Roditis to All State Painting**.

- Court of Claims of Ohio document listing **George Roditis as a representative of All State Painting**.

- State of Ohio Articles of Incorporation documents listing **George Roditis as an incorporator of 360 Construction Company**.

- Ohio Department of Transportation document listing **George Roditis** with Bridge Painting Course Certification for **360 Construction Company**.

- Ohio Department of Transportation Director's Claims Board document which names **George Roditis as a representative of 360 Construction**.

- U.S. Department of Justice news release and Cleveland.com articles in regards to indictment of All State Painting and Contracting officer.

We would greatly appreciate the Department's careful consideration of the information we have presented which directly links 360 Construction Company as a restructured version of All State Painting before awarding the above referenced project.

Resp. to Mot. for Summ. J. [dkt. #90], Ex. J, Letter dated June 9, 2010 at 1-2. The "OhioBiz.com" website is apparently a private search or directory website, which presumably lists businesses in Ohio. The "LocalConstruction.net" website is apparently a similar private directory for construction contractors. The Ohio Court of Claims "document" lists George Roditis in the cc: list at the end. In the preamble of the Ohio Director's Claims Board decision, George Roditis and Steve Roditis are listed as representing 360 Construction at the hearing. The rest of the documents are the same as those attached by Bakalis to the June 7, 2010 email message.

-6-

On June 15, 2010, attorney Andrew Richner, acting on behalf of Atsalis Brothers, called Leon Hank at MDOT and discussed 360 Construction and All State. Hank memorialized the conversation in an email, in which he stated:

> Andrew Richner of Clark Hill reached me to discuss the award of the MBA bridge painting contract. He said he had been retained by Atsalis Bros to challenge the award of the contract. He asked me for a status of the award and our review of the Atsalis' allegations about the low bid 360 Construction Company.
>
> He asked me about approvals for this award at the MBA Board, the State Administrative Board, and the State Transportation Commission levels. He also asked about what discretion MDOT or other boards might exercise in rejecting this bid or the award to 360 Construction based on allegations Atsalis has made.
>
> He reviewed the performance issues related to [the] 2006 painting job by Allstate [sic] and he said the [principal] players and their equipment were with 360 Construction Company today. He asked me how we could award a second contract to what is basically the same company with a different name after they failed to perform the first time. He said, you wouldn't do that for a construction project at your own home, so why would the government do it?

Resp. to Mot. for Summ. J. [dkt. #90], Ex. Q, Email thread dated June 16, 2010 at 1.

On June 17, 2010, Gregory C. Johnson of MDOT replied to Manous and wrote that MDOT had reviewed the allegations, contacted references for 360 Construction, and received contractor evaluations of 360 Construction from the Ohio Department of Transportation, all of which indicated that 360 was qualified to do the work on the Mackinac Bridge and had shown "excellent performance" on past projects. Johnson stated: "MDOT's investigation also found that George Roditis was not an owner of Allstate but an employee for one year. He is not a current owner of 360 but a superintendent for the company. George Roditis was never charged in the Cuyahoga River Bridge project bribery incident." Resp. to Mot. for Summ. J. [dkt. #90], Ex. L, Letter dated June 17, 2010 at 1. Johnson concluded by stating, "At this point, MDOT believes that we have completed a thorough investigation of all information provided by Atsalis Bros. Painting, and the information

we have on file, and feel confident on moving forward with the award of Contract 86000-M00221

to the confirmed low bidder, 360 Construction Company, Inc." *Id.* at 2.

On June 23, 2010, Richner wrote a memorandum concerning the "Bid Proposal to Paint

Mackinac Bridge," stating:

> The lowest bidder, 360 Construction Company Inc. ("360") of Ohio, which underbid
> Atsalis by approximately $250,000 on the $17 million project, is related through
> common ownership and management to Allstate Painting & Contracting Co., a.k.a.
> All State Painting ("Allstate"), of Ohio.  Allstate has been sued by MDOT and the
> Mackinac Bridge Authority (the "Authority") for breach of warranty, among other
> things, relating to its substandard performance on an earlier contract to paint the
> Mackinac Bridge.  Accordingly, MDOT should disqualify 360 as an eligible
> contractor and/or reject 360's bid and should award the contract to paint the bridge
> to Atsalis as lowest qualified bidder.

Resp. to Mot. for Summ. J. [dkt. #90], Ex. M, Memorandum dated June 23, 2010 at 1.  Richner

wrote in the "Summary" section of his memorandum:

> In light of the fact that 360 principals were Allstate principals and were directly
> involved in Allstate and management of its prior contract to paint the Mackinac
> Bridge, 360 should be disqualified as an eligible contractor under MDOT's
> Administrative Rules Governing the Prequalification of Bidders for Highway and
> Transportation Construction Work and/or 360's bid should be rejected as provided
> under the bid proposal and MDOT's Standard Specifications for Construction ("Spec
> Book").
>
> If 360's bid is rejected, the Spec Book provides that the next lowest qualifying
> bidder, Atsalis, should be awarded the bridge contract.  Re-bidding of the cont[r]act
> is not required in the bid proposal or the Spec Book.

*Ibid.*  Richner went on to catalog "Facts Supporting Disqualification of 360 and Its Bid," writing:

> Following is a summary and reference to attached related documents describing the
> close relationship between 360 and Allstate as well as the sordid history of Allstate.

### I. 360 Construction Co. Inc. is *de facto* successor to Allstate

> Elias Kafantaris owned Allstate with partner George Roditis (Exhibit A).

-8-

> George Roditis . . . is listed as an owner and officer of Allstate in various governmental and other public records, starting in at least 2000 through at least 2009, including as Vice President of Allstate in all of the Annual Reports, for years 2003, 2004, 2005, and 2006, filed with the Michigan Department of Labor & Economic Growth (Exhibits B, C, D, E, F, G, H). George Roditis was named as a third party defendant, along with Allstate, his wife Renee, and Mr. Kafantaris, in a 2006 lawsuit brought by the Ohio Department of Transportation (Exhibit I).

> Steve Roditis . . . was employed by Allstate and was Allstate's "Quality Control/competent person" assigned to the Mackinac Bridge project in 2003 (Exhibits J, K).

> On July 1, 2008, property was conveyed by Mr. Kafantaris to 360 (Exhibit L).

> Steve and George Roditis are both incorporators of 360 (Exhibit M).

> Steve Roditis is Registered Agent of 360 (Exhibit N).

> Steve Roditis is listed as owner and President of 360 (Exhibits O, P).

> Allstate and 360 use the same business address (Exhibits B, C, D, E, F, J, K, P, Q).

*Id.* at 2. Richner wrote in the "Conclusion" section of his memorandum:

> 360 is in effect the *alter ego* of Allstate. MDOT's history of problems with Allstate, and other issues with persons involved with both companies, should require MDOT's disqualification of 360, rejection of its bid, and award of the contract to Atsalis as the lowest responsible bidder.

*Id.* at 3. Richner listed "Garry Manous (Atsalis Brothers Painting Co.)" in the cc: section of his memorandum. *Ibid.*

Exhibit B to Richner's memorandum is a LexisNexis search return for "Allstate Painting & Contracting Co" which lists an address of 1256 Industrial Parkway, Brunswick, Ohio for dates from 2007 through 2010. Exhibit L to the memorandum is designated a "Records Search Document Detail" of unspecified origin. It lists a conveyance recorded as "SHER/D 07-01-2008," and lists the

-9-

parties as "KAFANTARIS, ELIAS 1-GRANTOR," "KAFANTARIS, EVANGELINA 1-GRANTOR," and "360 CONSTRUCTION CO INC 2-GRANTEE." *Id.* at 35.  The conveyance recorded on July 1, 2008 in Medina County, Ohio reflects that the property at 1256 Industrial Parkway was foreclosed by Geuga Savings Bank and an order of sale was entered on February 11, 2008.  The Sheriff of Medina County subsequently sold the property at auction to 360 Construction Company Inc. for the highest bid of $870,000.  Exhibit P to the memorandum is a LexisNexis search return for "360 Construction Company" showing the address 1252 Industrial Parkway, Brunswick, Ohio in February and March 2010.  Richner's memorandum does not explain the discrepancy between 1256 Industrial Parkway and 1252 Industrial Parkway shown in the exhibits to his memorandum regarding his claim that 360 and Allstate used "the same address," but it appears from the recorded conveyance that 360 does own the property at 1256 Industrial Parkway, which was formerly owned by Allstate prior to foreclosure.

Exhibit B to Richner's memorandum lists George Roditis as "Owner," "President," and "Vice President" of Allstate.  Exhibit D lists George Roditis as "Vice President" of Allstate in Michigan foreign corporation filings.  Exhibit P lists Steve Roditis as "President" and "Owner" of 360, and Spiros Paterakis as "President."  That exhibit does not refer to George Roditis at all.  Exhibit Q appears to be a records search of unknown origin that lists Steve Roditis and Paterakis as "Principals" of 360.  Exhibit Q does not name George Roditis in any capacity.

Exhibit K to the memorandum is an "SSPC Audit Summary" for an inspection of work done by Allstate on the Mackinac Bridge dated August 5 and 6, 2003, which includes notes that Steve Roditis, "[t]he contractor's QC/competent person" arrived at the job site and spoke to auditors during the inspection."  Resp. to Mot. for Summ. J. [dkt. #90], Ex. M, Memorandum dated June 23,

2010 at 26, 28. Exhibit Y to the memorandum includes an "Order and Judgment by Default Against Defendants" dated February 3, 2007 in a lawsuit filed in the United States District Court for the District of Columbia by the International Painters and Allied Trades Industry Pension Fund against Allstate. In its order, the district court found that "Elias Kafantaris ('Individual Defendant'), through his position as officer and sole shareholder of [Allstate] . . . possesses . . . authority and control and decision-making power over the distribution of [Allstate's] revenues." *Id.* at 70-71.

Richner sent his memo to Bill Gnodtke at MDOT. Richner also went to a Transportation Commission meeting on behalf of Atsalis, talked about the memo with a number of attendees, and gave a copy of it to at least one person. Richner talked to MDOT and Bridge Authority directors and commissioners Jim Scalici, Ted Wahby, Kirk Steudle, and Myron Frierson. Scalici and Wahby were Bridge Authority commissioners, and Steudle was director of MDOT. Frierson was an auditor with MDOT. Richner sent a copy of the memo to Steve Liedel at the Governor's office. Richner also spoke to Mike Garaviglia and Stu Sandler in the Michigan attorney general's office.

In July 2010, after Richner sent his memo to MDOT officials, the department asked the Office of Commission Audits to look into the charges Atsalis and Richner raised. The auditor carried out a lengthy review, concluding on November 23, 2010 that (1) Allstate was 90% owned by Elias Kafantaris and 10% by Pete Toptsidis; and (2) George Roditis was never an owner of Allstate, but he was an owner of CH-IK Painting, Inc. Kafantaris was the majority owner of CH-IK. George Roditis owned one-third of CH-IK, but it went out of business and he lost his investment in CH-IK in 2004, the same year that he resigned from Allstate; (3) Steve Roditis and Spiros Paterakis owned 360; (4) George Roditis did not own 360; (5) Steve Roditis was once an employee of Allstate; (6) George Roditis resigned as an officer and employee of Allstate in 2004; and (7) in 2010,

-11-

George Roditis was an employee of 360.  The auditor concluded that "[b]ased on our findings . . . we conclude that the statements referring to 360 being related to Allstate are without merit."  Resp. to Mot. for Summ. J. [dkt. #90], Ex. O, Office of Commission Audits Report SP-11-001 at 3.  The auditor noted that George Roditis had admitted to bribing a public official, even though he was never charged, and recommended that MDOT "take action to assure that George Roditis is barred from participation in department projects now and in the future."  *Id.* at 6.

After the inquiry MDOT conducted in response to the letters and lobbying by Atsalis Brothers and Richner, the contract was awarded to 360 six months later than it would have been, leaving 360 with that much less time to complete the twenty-eight month bridge painting job. Kimberly Nowack of MDOT testified that the Bridge Authority would have been amenable to an extension of the completion date due to the time lost during the inquiry, and she would have recommended one be granted.  However, Steve Roditis testified that as of May 2012, 360 had not asked for an extension of time to complete the contract, although it might ask for one later.

Plaintiff 360 filed its complaint on May 27, 2011, an amended compliant on January 24, 2012, and a second amended complaint on February 28, 2012.  The plaintiff contends that the defendants are liable for defamation, libel, tortious interference with a contract, tortious interference with a business relationship, "unlawful disparagement," and negligence.  The defendants filed their motions for summary judgment after discovery closed.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Highland Capital*, 350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

This case is before the Court on the basis of diversity jurisdiction under 28 U.S.C. § 1332, and the plaintiff's claims are based entirely on state law. Therefore, the Court must apply the law of the forum state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). All agree that Michigan law applies to this dispute. If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V. & O Press Co.*, 770 F.2d

-14-

601, 604 (6th Cir. 1985)). "Relevant data includes the state's intermediate appellate court decisions, as well as the state supreme court's relevant *dicta*, restatements of the law, law review commentaries, and the majority rule among other states." *Ososki v. St. Paul Surplus Lines*, 156 F. Supp. 2d 669, 674 (E.D. Mich. 2001) (internal quotation marks and citation omitted).

A.

The defendants argue in their motions that all counts of the second amended complaint should be dismissed because the plaintiff has not offered evidence on each element of its respective claims. Plaintiff 360 has made no affirmative showing in support of, and therefore has apparently abandoned, its claims for tortious interference with a contract (count I), "unlawful disparagement" (count V), and negligence (count VI). It advanced no argument in its briefing to support those claims, does not define or even mention the elements of any of those counts, and appears to rely solely on the elements of defamation and tortious interference with a business expectancy to survive summary judgment. Plaintiff 360 does not cite any Michigan statute or case law that defines the elements of "unlawful disparagement," has offered nothing to establish the duty Atsalis owed it under any Michigan decisional law, and does not allege that any contract existed at the time of the alleged tortious interference. Because 360 has come forward with nothing to support the elements of the claims purportedly advanced in those counts, the Court will dismiss counts I, V, and VI as abandoned and without merit.

Concerning the claims of defamation and tortious interference with a business expectancy, the defendants do not argue that Richner exceeded his authority as an agent of Atsalis, and do not appear to contest the claim that Atsalis is liable for his statements under the theory of *respondeat superior*. They argue instead only that all of the statements made by the individual defendants were

-15-

either true, substantially true, matters of opinion, or privileged, and that if the statements were subject to the qualified shared interest privilege, the plaintiff has not shown that they were made with malice. Nonetheless, there is no independent cause of action for *respondeat superior*, which is the label the plaintiff placed on count VII of the second amended complaint. That count will be dismissed as well.

### B.

Counts III and IV of the second amended complaint allege defamation. To establish a claim for defamation, the plaintiff must show (1) a false and defamatory statement concerning the plaintiff, (2) unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statements irrespective of special harm, or the existence of special harm caused by the publication. *Wilson v. Sparrow Health System*, 290 Mich. App. 149, 154-55, 799 N.W.2d 224, 227 (2010). The defendants argue that all of the statements they made about 360 Construction are true. But they also say that the statements they made are subject to a qualified privilege — the shared interest privilege — so that the plaintiff also must prove that the defendants made the statements with malice. Malice is established when there is proof that a defamatory statement was made "with knowledge of its falsity or reckless disregard of the truth." *Prysak v. R L Polk Co.*, 193 Mich. App. 1, 15, 483 N.W.2d 629, 636 (1992).

### 1.

It is undisputed that "Michigan law recognizes a qualified privilege as applying to communications on matters of 'shared interest' between parties." *Rosenboom v. Vanek*, 182 Mich. App. 113, 117, 451 N.W.2d 520, 522 (1989). Whether the privilege applies to statements made by a business operator about a competitor vying for the same contract, as in this case, is another matter.

The determination that the privilege applies is a question of law for the Court to decide. *Lawrence v. Fox*, 357 Mich. 134, 139-40, 97 N.W.2d 719, 722 (1959) ("As is true generally with respect to matters of privilege, it is for the court to determine whether or not the external circumstances surrounding the publication are such as to give rise to a privileged occasion."); *Prysak*, 193 Mich. App. at 14-15, 483 N.W.2d at 636.

The origin of the shared interest privilege in Michigan can be traced to *Bacon v. Michigan Railroad Co.*, 66 Mich. 166, 33 N.W. 181 (1887), in which the state supreme court required a discharged railroad worker to prove both falsity *and* malice when alleging that he was defamed by his employer, who included his name on a "discharge list," on which it recorded the name and reason for discharge of every worker that it fired. The Railroad published the list to its hiring agents around the country, who would consult the list before hiring any worker, and would dismiss an applicant that was fired for any sort of bad conduct, such as drunkenness or incompetence. The court reasoned that the railroad company was entitled to protect itself against hiring incompetent workers when pursuing the important business of a common carrier, and that interest embodied an equally important public policy. The court set out a general rule: "The great underlying principle upon which the doctrine of privileged communications stands, is public policy. . . . Qualified privilege . . . extends to all communications made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty." *Id.* at 169-72, 33 N.W. at 183-84.

Courts have recognized that allowing a qualified privilege comes with a cost to those individuals who are damaged by the spread of false information about them in the public sphere. But private rights must be balanced against the public interest and sometimes must yield to it. "In

-17-

general, a qualified privilege is recognized where the public interest in activities which presuppose frank communication on certain matters between persons standing in particular relationships to each other outweighs the damage to individuals of good faith but defamatory utterances relevant to the interests of those involved." *Merritt v. Detroit Memorial Hospital*, 81 Mich. App. 279, 284, 265 N.W.2d 124, 126 (1978).

Courts have recognized that the shared interest privilege does not exist in a vacuum. "This defense rests upon considerations of public policy. . . . The privilege thus afforded is not, . . . as the mathematicians would put it, a constant. It varies with the situation, with what is regarded as the importance of the social issues at stake." *Lawrence*, 357 Mich. at 137-38, 97 N.W.2d at 721. Similarly, the *Bacon* court, in emphasizing the public policy grounding for the privilege, recognized that the privilege does not exist for the personal benefit of the defendant, but serves to abrogate the rights of the plaintiff only where silence could lead to public harm.

Inherent in the balancing of private and public interests is the idea that the alleged defamatory communications be made with the intent of advancing the *public* interest. Courts have used the term "good faith" to describe the statement-maker's proper motive. Because the privilege rests on a foundation of public policy, only communications made in good faith, with the legitimate purpose of advancing that policy, are properly entitled to the shelter it provides. "A vast majority of state rules regarding qualified privilege include a requirement of 'good faith.'" A.G. Harmon, *Defamation in Good Faith: An Argument for Restating the Defense of Qualified Privilege*, 16 Barry L. Rev. 27, 30 n.16 (2011). Modern iterations of the privilege by Michigan appellate courts make clear that a showing of "good faith" is essential to a defendant's ability to invoke the privilege: "The elements of a qualified privilege are (1) *good faith*, (2) an interest to be upheld, (3) a statement

-18-

limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak*, 193 Mich. App. at 14-15, 483 N.W.2d at 636 (emphasis added) (citing *Bufalino v. Maxon Bros., Inc.*, 368 Mich. 140, 153, 117 N.W.2d 150, 156 (1962); *Smith v. Fergan*, 181 Mich. App. 594, 596-597, 450 N.W.2d 3, 4 (1989)). "[T]he whole point of the defense is to grant latitude to an occasion where a sanctioned interest is sincerely and earnestly pursued. . . . As such, proof of a motive other than pursuit of the common interest should result in denial of the defense." Harmon, *supra*, at 44. "If the interest is not pursued sincerely, the occasion is misappropriated, and the law will not permit the doctrine to disguise a personal use, even if that use is not inspired by base motives." *Id.* at 45.

Michigan courts have declined to apply the shared interest privilege where the interest at stake was a private one. *See Sias v. General Motors Corporation*, 372 Mich. 542, 127 N.W.2d 357 (1964) (holding that a corporate employer had no interest sufficient to justify its statement that an employee was discharged for "misappropriation of company property," made to remaining employees for the purpose of restoring morale among them); *Harrison v. Arrow Metal Products Corp.*, 20 Mich. App. 590, 172 N.W.2d 875 (1970) (holding that the defendant was not entitled to any qualified privilege for false accusations of theft given under the guise of "employment references," despite earlier holdings by Michigan courts that had extended the privilege to statements of reference from a prior to a prospective employer); *see also Haddad v. Sears Roebuck & Co.*, 526 F.2d 83, 85 (6th Cir. 1976) (holding in a case where a store manager announced to disgruntled employees that the plaintiff, a co-corker, was fired for gambling, "that in calling in fellow employees of plaintiff and 'explaining' the circumstances of his separation, defendant

-19-

corporation was serving its own particular interest. . . . No privilege extended to the communication to them and the trial court properly so held").

And in *Mid-America Food Service, Inc. v. ARA Services, Inc.*, 578 F.2d 691 (8th Cir. 1978), the Eighth Circuit declined to apply the shared interest privilege to statements made by a disappointed bidder on a public contract. In that case, when the defendant learned that the plaintiff had been awarded the contract, the defendant told the agency that let the contract, which was to furnish food services, that the plaintiff was in financial trouble and "had been 'nearly closed down' by the health department." The court stated:

> The only reasonable inference from the evidence in the case was that Coleman's statements were made in an effort to further the business interests of ARA by securing advantage over a competitor through injury to the competitor's reputation. ARA's pecuniary interest in this context is not an interest entitled to the protection of qualified privilege. *See Aetna Life Insurance v. Mutual Benefit Health and Accident Assoc.*, 82 F.2d 115, 119 (8th Cir. 1936); Restatement (Second) of Torts § 594, Comment g (1976); 50 Am. Jur. 2d § 198, at 703. . . . The district court did not err in ruling against qualified privilege.

*Mid-America*, 578 F.2d at 701.

The defendants here place great emphasis on MDOT's published policy of encouraging reports of fraud and abuse. The MDOT "Notice to Contractors" states:

> The Michigan Department of Transportation (MDOT) has established a Fraud and Abuse Hotline for employees, contractors, consultants, and others to report suspected fraud or abuse, such as: prevailing wage non-compliance, theft, kickbacks, wrongful claims, contract fraud, use of materials that do not comply with specifications, unapproved substitution of materials, commodities, or test samples, or failure to follow contract procedures.
>
> Anyone with knowledge of any activity involving the potential for fraud or abuse is requested to call the Hotline at (toll free) 1-866-460-6368 or 517-241-2256.
>
> Every prime contractor shall keep posted on the construction site, in a conspicuous place, a copy of this Notice.

Mot. for Summ. J. [dkt. #80], Ex. 2, Notice to Contractors.  Like the "strong policy" of the University of Michigan that the court of appeals noted in *Rosenboom v. Vanek*, the MDOT policy here does support the conclusion that a contractor could be entitled to a shared interest privilege where, upon a proper occasion, it makes a good faith report of "suspected fraud or abuse."

However, the question of qualified privilege is not settled by the existence of a duty alone, because the defendants must also establish that they acted in good faith to promote the public interest.  This they cannot do on the record presented to the Court, for two principal reasons.  First, the public policy the defendants cite — preventing the waste of public dollars by incompetent or unreliable contractors, and preventing the corruption of the fair bidding process by public and private graft — is counterbalanced by an equally important policy: avoiding the waste of public resources and delay in carrying out important public works projects, and in ensuring the fair, prompt, and orderly administration of the bidding process.  The defendants argue that denial of the privilege would "chill" the reporting of "suspected fraud and abuse."   But imprudent extension of the privilege would invite needless waste and delay, by encouraging disappointed runner-up bidders to engage in baseless and unrelenting slander in an attempt to seize for themselves contracts fairly awarded to a competitor.  Left unchecked, the blanket extension of the qualified privilege to any communication between a contractor and a public agency would encourage ceaseless rounds of accusation and counter-accusation between competitors following each unveiling of a bid.  "Sound public policy and the orderly administration of public contracts are not furthered by eliminating recourse against competitors who negligently feed false information to public officials." *A&B-Abell Elevator Co. v.  Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio  St. 3d 1, 18, 651 N.E.2d 1283, 1297 (1995) (Pfeifer, J., dissenting).

The second reason is that the weight of the evidence presented convinces that Court that the interest the defendants sought to advance was their own, not that of the public, and therefore they cannot establish the good-faith component of the qualified privilege.  Several factors lead the Court to this conclusion.  First, as 360 points out, Atsalis and 360 had bid against each other on other public contracts, but Atsalis never made any suggestion of suspected fraud or abuse by 360 until it had a direct, financial incentive to do so.  Atsalis admits that its owner, Nick Atsalakis, had direct knowledge of the substandard work done by Allstate Painting on the South/Center span project in 2003 and 2004, but it offers no explanation why it waited until 2010 to pursue its alleged shared interest in "keeping Allstate and its employees away from the bridge."

Second, Atsalis appears to have disregarded the clear facts suggesting its charges were false, because the unadorned truth did nothing to advance the admitted self-interest Atsalis had in disqualifying 360 and claiming the contract for itself.  Instead of merely pointing out that George Roditis, with his sordid past involvement with Allstate, was working for 360 Construction, the defendants made the following assertions, which are objectively false:

- "360 Construction Company, Inc. is simply a restructured version of the former All State Painting of Brunswick, Ohio whom the Mackinac Bridge Authority currently has a $1 million dollar lawsuit against."
- "[360] is related through common ownership and management to Allstate Painting and Contracting Co."
- "360 principals were Allstate principals and were directly involved in Allstate and management of its prior contract to paint the Mackinac Bridge."
- "[360 is] a restructured version of All State Painting."
- "[T]he [principal] players and their equipment [from Allstate are] with 360 Construction Company today."
- "[360] is basically the same company with a different name."
- "360 Construction Co. Inc. is *de facto* successor to Allstate."
- "360 is in effect the alter ego of Allstate."

Atsalis contends that the "shared interest" was vindicated when MDOT's auditor eventually recommended that George Roditis not be allowed to work on any public project. But Atsalis's lobbying campaign in this case obstructed rather than advanced that interest, because six months were consumed by the agency disposing of all the baseless accusations and drilling down to the only nugget of truth that left it with concern in the end. Had Atsalis and Richner, as they contend, only been focused on ensuring that "bad actors" like George Roditis were excluded from the award of a public contract, then they simply could have reported their valid, objectively verifiable warnings that Roditis had admitted to past corruption and was a key employee of 360. But Atsalis had no motive to make that report, because there was no reward in simply disqualifying a corrupt employee of a competitor; Atsalis stood to gain only if it could eliminate 360 from the competition entirely, leaving Atsalis to win the contract as the presumptive runner-up.

Finally, the record contains ample proof from the defendants' own publications that the charges they brought were baseless. The defendants did not just make the general claim that the companies had "common ownership and management" and 360 was the "*de facto* successor" to Allstate; they backed up those contentions with specific assertions of material fact, all of which turned out to be false, and all of which were contradicted by documents that the defendants relied on to substantiate those accusations. The defendants asserted that: (1) "Elias Kafantaris owned Allstate with partner George Roditis"; (2) "360 principals were Allstate principals"; and "On July 1, 2008, property was conveyed by Mr. Kafantaris to 360." Exhibits attached to Richner's memorandum show each of those statements to be false. Exhibit Y recites a judicial finding that Kafantaris was the "sole shareholder" of Allstate. Exhibit P to the memorandum lists Steve Roditis as "President" and "Owner" of 360, and Spiros Paterakis as "President"; that exhibit does not refer

-23-

to George Roditis at all.  Exhibit Q lists Steve Roditis and Paterakis as "Principals" of the corporation; it likewise does not mention George Roditis.  Richner's contention that "incorporators" should be viewed the same as owners until equity is distributed to shareholders is unpersuasive, because the company was formed in 2001 and began to operate in 2004, six years before the communications and record searches occurred.  Despite the clear and direct evidence that Richner himself unearthed showing no overlap of ownership between the companies, Richner forged ahead with claims supported by nothing more than a single unsourced and unverified entry on a private Internet business directory and a LexisNexis search return page with an unattributed designation of George Roditis as "owner" of Allstate.  As to the alleged conveyance, Exhibit L refers to a transfer abbreviated as "SHER/D 07-01-2008," which to any competent attorney should have suggested further investigation into what was apparently a "sheriff's deed" indicating a foreclosure sale, not a direct conveyance as alleged by Richner.

The Court finds that the defendants are not entitled to the protection of the shared interest privilege.  The plaintiff is not required to prove that the defamatory statements were made with malice.

## 2.

The record contains ample proof of the remaining elements of the defamation claim.  The defendants do not dispute that they published the cited statements and that the statements published tended to discourage a third party — MDOT — from dealing with 360.  In fact the defendants repeated loudly and often their manifest purpose in making those statements, which in their stated opinion should "require MDOT's disqualification of 360, rejection of its bid, and award of the contract to Atsalis as the lowest responsible bidder."

-24-

A jury reasonably could conclude that the statements made were objectively false based on the documents that Richner attached to his memorandum, as discussed above. Richner argues that his statements about common ownership expressed only an opinion, and the "sting" of the truth that George Roditis was a manager at both companies is the same as the assertion of "common ownership." Despite the urging of the defendants, the Court must conclude, viewing the evidence in the light most favorable to the plaintiff, that none of the statements are opinion or substantially true.

"A communication is defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." *Ireland v. Edwards*, 230 Mich. App. 607, 614, 584 N.W.2d 632, 636 (1998). The sting of the *de facto* successor and *alter ego* accusations is materially different from the sting of the truth, as shown by MDOT's reaction to the charges. The agency took six months to investigate the defendants' assertion that 360 and Allstate were "the same company with a different name," and would certainly have declined to award the contract to 360 if it had turned out to be true. But when MDOT determined the truth, the agency awarded the contract to 360, with 360's concession that George Roditis would not work on the project.

Moreover, a jury reasonably could conclude that the defendants acted with fault amounting to at least negligence. Even under the strictest standards cited by the defendants, a jury could reasonably find that Richner engaged in purposeful avoidance of the truth and made a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of a publication.

The defendants are not entitled to summary judgment on the plaintiff's defamation claim.

C.

Count II of the second amended complaint alleges tortious interference with a business expectancy. To prevail under Michigan law, the plaintiff must plead and prove "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a termination of the relationship or expectancy, and resultant damage to the plaintiff." *Dalley v. Dykema Gossett PLLC*, 287 Mich. App. 296, 323, 788 N.W.2d 679, 696 (2010); *see also Cedroni Association, Inc. v. Tomblinson, Harburn Associates, Architects & Planners Inc.*, 492 Mich. 40, 45, 821 N.W.2d 1, 3 (2012). Moreover, the plaintiff must prove that the interference was "improper." *Advocacy Org for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365, 383, 670 N.W.2d 569, 579 (2003). "The 'improper' interference can be shown either by proving (1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiffs' contractual rights or business relationship." *Id.* at 383, 670 N.W.2d at 580.

Richner argues that it is not enough merely to establish interference with a business relationship; 360 must also show malice or an act that is "wrongful per se." The defendants contend that they had no improper motive in making statements to MDOT in their attempt to wrest the contract from 360. However, the argument that their actions were motivated purely by business interests "cannot, standing alone, operate as a miracle cure making all that was wrong, right." *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 96, 443 N.W.2d 451, 463 (1989). "[T]he defendant's motive is but one of several factors which must be weighed in assessing the propriety of the defendant's actions. Other factors include (1) the nature of the defendant's conduct, (2) the nature

-26-

of the plaintiff's . . . interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference." *Id.* at 96-97, 443 N.W.2d 451, 463.  Improper motives include motives that are illegal, unethical or fraudulent. *Dolenga v. Aetna Cas. & Sur. Co.*, 185 Mich. App. 620, 626, 463 N.W.2d 179, 182 (1990).

The Court believes that making demonstrably false statements about a business competitor for the purpose of dissuading prospective customers from doing business with the target of the defamatory statements amounts to an "improper" act of interference.  Although, in the Court's view, the defamation counts do not require proof of malice, as discussed above, there is ample evidence from which a jury could conclude that the defendants made disparaging statements about the plaintiff and its association with Allstate Painting with knowledge that those statements were false.

The defendants also argue that the plaintiff cannot establish a valid business expectancy. They cite *Cedroni Association, Inc. v. Tomblinson, Harburn Associates, Architects & Planners Inc.* for its holding that the disappointed low bidder on a public contract "did not have a valid business expectancy because plaintiff had no reasonable expectation of being awarded the contract, only 'wishful thinking.'"  *Cedroni*, 492 Mich. at 45, 821 N.W.2d at 3.  In *Cedroni*, the disappointed low bidder sued an architect who recommended awarding the bid to another company.  The Michigan Supreme Court affirmed summary judgment for the architect, and explained: "That plaintiff as the lowest bidder on a public contract had no valid business expectancy is supported by the longstanding rule in Michigan that a disappointed low bidder on a public contract has no standing to sue in order to challenge the award of a contract to another bidder."  *Id.* at 46, 821 N.W.2d at 3.

The Court believes *Cedroni* is readily distinguishable on several bases.  For one, in *Cedroni* the school district superintendent testified that "there was no communication of any intent to accept

-27-

[plaintiff's] bid." *Cedroni*, 492 Mich. at 49, 821 N.W.2d at 5. Here, the plaintiff was not the disappointed low bidder; it had won the contract and would have been given the award in June 2010 but for the defendants' interference in the process. Also, as the plaintiff points out, in *Cedroni*, the bids were taken under a Michigan statute that required bids be awarded to the "lowest responsible bidder," not just the low bidder. The plaintiff argues that there is at least a question of fact as to whether the letters sent by MDOT after the unveiling of the bids raised the expectancy to a "reasonable likelihood or probability," as required by *Cedroni*. For instance, on June 9, 2010, the same day that Manous sent his letter, MDOT sent two copies of the contract to 360 for signature. Also, MDOT stated in its June 17, 2010 letter that it was proceeding with the award of the contract to the low bidder, and a week after that letter, representatives of 360 attended a "preconstruction meeting" with MDOT, to discuss the sequence of work, safety program for the job, and logistical details.

The plaintiff advances a fair reading of *Cedroni* and plausibly distinguishes its holding from the present case, based on the affirmative acts taken by MDOT to at least begin the award of the contract to 360 before the interruption of that process by the defendants' accusations. A jury therefore reasonably could conclude that the expectancy held by 360 had passed the point of "wishful thinking" and matured to a "reasonable likelihood or probability," as *Cedroni* requires. 492 Mich. at 46, 821 N.W.2d at 3.

The defendants are not entitled to summary judgment on Count II of the second amended complaint.

-28-

III.

The Court concludes that the plaintiff has not offered evidence or argument to support the claims in counts I (tortious interference with a contract), V (unlawful disparagement), VI (negligence), or VII (*respondeat superior*) of the second amended complaint, and those counts will be dismissed. The record does not permit summary judgment for the defendants on the remaining counts of the second amended complaint.

Accordingly, it is **ORDERED** that the defendants' motions for summary judgment [dkt. #77, 80] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that counts I, V, VI, and VII of the second amended complaint are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   December 28, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 28, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL